Moncure, P.
This is an appeal from a decree of the late District court at Charlottesville, affirming a decree of the Circuit court of Rockbridge county, dissolving an injunction of a sale of a tract of land in said county under a deed of trust to secure the payment of certain bonds therein mentioned ; the alleged ground of the injunction being, that one of the said bonds, and the only-one about which there was any controversy, had been paid and discharged, by the delivery and acceptance of certain Confederate bonds as an accord and satisfaction.
In April 1858, James M. Ranson sold and conveyed *407 •the tract.of land aforesaid to Joseph H. Maddox, and on the 15th day of the same month, the said Maddox conveyed the same laud to John B. Baldwin, in trust, besides other purposes, to secure the payment of three bonds given for part of the purchase money of the said .land, one of them for $6,492.96, due 26th January 1862, .another for $6,150.56, due 26th January 1868, and the other for $5,808.16, due 26th January 1864.
In April 1859, the said Maddox sold the said tract of land, (except 21 acres previously sold and conveyed by him to J. H. Myers), together with a large amount of personal property, to Samuel J. Campbell, for the sum of fifty thousand dollars, out of which the said Campbell agreed with the said Maddox to pay, in the first place, the said three bonds of the said Maddox to the said Banson, secured by deed of trust on the said land ,as aforesaid.
The first of the said three bonds, to wit: the one due 26th January 1862, was duly paid at maturity. The third of them, to wit: the one due 26th January, 1864, has also been settled, since this litigation commenced. The only one in controversy, therefore, is the second, which became due on the 26th of January 1863.
When that bond became due, and for some time previously, Banson resided in the county of Jefferson, and Campbell resided in the county of Bockbridge, about a huudred and fifty miles apart, and they continued so to reside until the end of the war. The military lines of the enemy generally ran between them, the intermediate country was often a theatre of battle, and personal communication between Jefferson and Bockbridge was often attended with difficulty and danger. This state of things •existed in December 1862, and generally afterwards until the end of the war.
In that month, to wit; December ’62, Campbell, for the purpose of taking up the second of the said three bonds of Maddox to Banson at its maturity on the 26th *408 of January 1868, placed his blank cheek on the bank of' Rockbridge in the hands of John Humphreys, an uncle of Campbell’s wife, who lived in Jefferson, about five-miles from the residence of Ranson, but was then in Rockbridge, which county he occasionally visited during the war; and he, Campbell, empowered Humphreys, on his return to Jefferson, to call on Rauson, to fill up the-cheek if necessary with the proper amount, and to pay and take up the said second bond, if Ranson should be-willing to accept payment in Confederate money, in which the said check was payable, and which was then the only currency of the country.
Humphreys, accordingly, received the check and undertook the agency for Campbell, and in a short time thereafter, returned to his home in Jefferson, called upon Ranson, and proposed to make payment of the bond in tbe manner and by the means aforesaid. Confederate-money was then at a discount of about three to one as-compared with gold. And, as might well have been expected, Ranson promptly refused to accept payment in the medium proposed : so promptly and positively, that' he did not even look at the check which Humphreys had in his possession.
But Ranson said, at the same time, that payment of the said bond might be made in Confederate bonds of a. certain description, which he named. Humphreys requested him to state that fact in writing, which he-accordingly did ; and a paper in the following words was written by Ranson and handed to Humphreys, viz :
“ $6,150.56. Hue 26th January, 1863, from S. J.. Campbell to James M. Ranson. This can be paid in. registered eight per cent. Confederate bonds, issued to - run the longest period of time, bought at par. Six one-thousand dollar bonds, and one 150 dollar bond. They,. of course, must be bought with treasury notes of the-issue prior to Hecember 1st, 1862. J. M. R.”
It does not appear at what precise time this paper was.. *409 handed by Hanson to Humphreys. It bears no date. The time, however, was probably in December, or early in January, and some weeks before the 26th of that mouth, when the bond became due. Humphreys left Rockbridge for Jefferson in December, and the presumption is that he called on Ransou directly after he got to Jefferson. It was not intended or expected that Humphreys would in any short time revisit Rockbridge, or that he would deliver Ranson’s memorandum in person to Campbell, but merely that he would enclose it to him by letter to be sent by the first opportunity.
It appears that such an opportunity occurred immediately after the interview between Humphreys and Ran-son, and that Humphreys then wrote to Campbell, informing him of the particulars of that interview, and enclosing in the letter a copy of the memorandum aforesaid. There is some doubt whether that letter was ever received by Campbell. Probably it never was, and that it was destroyed by the bearer (who was taken prisoner on the way), to prevent its falling into the hands of the enemy.
Out of abundant caution, it seems, Humphreys wrote again to Campbell, and the following is so much of the letter aB relates to the subject under consideration :
" Soamppon, Jan. 20, 1868.
“My Bear Nephew : I wrote to you shortly after my return. I hope you received my letter. I had the promise that it should be forwarded to you. As the enemy in a day or two overran our county, probably it did not get to you ; and as this is the first opportunity since to send a letter, I write again. I had stated all about my interview with Mr. James M. Rauson, his declining to receive payment, and desiring you would procure registered bonds for him from the Confederate Government. He wanted six separate bonds, each $1,000, and one for $150, making $6,150.56, the amount of *410 your payment due the 26th of this month. I suppose 70u get the eight per cent, registered bonds for I have just heard that the Yankees have evaeuated "Winchester. If so, I can get this letter in.”
It will be seen that this letter is dated six days before the maturity of the bond, and that in it the writer speaks of having written shortly after his return, giving an account of his interview with Eanson ; which confirms the view above expressed, that that interview was either in December 1862, or early in January thereafter.
It appears that this letter of January 20, 1863, was not received by Campbell until April 1863, about three months after it was written, and that until that time, Campbell had received no information of the interview between Humphreys and Eanson, or of the willingness of Eanson to accept Confederate bonds, in payment of the bond of Maddox to him due on the 26th of January 1863.
Although Campbell received this letter in April 1863, yet he did not, even then, make any investment in Confederate bonds in the name or on the account of Eanson, nor did he do so until August and September following, about four months thereafter, when he made an investment in such bonds in said name, to the aggregate amount of $6,150, but not then even in bonds of $1,000 each, as directed, the treasurer refusing to cut up bonds when issued in the name of one party ; nor, it seems, in bonds which were “to run the longest period of time,” Campbell not having then been informed, as he says, of the requisition of Eanson on that subject.
In August 1863, Humphreys made another visit to Eockbridge, when he was informed by Campbell that he had made the investment in Confederate bonds as requested by Eanson, and when he delivered to Campbell the original memorandum which had been handed to Humphreys by Eansom as aforesaid. These Confederate bonds were intended to have been sent by Camp *411 pell to Ranson, by the hand of Humphreys on his return to Jefferson. Rut, it seems, that in consideration of the risk of their being lost in that way, it was deemed best by Campbell and Humphreys that they should be deposited in the Rockbridge bank for safe keeping, and a certificate of such deposit sent to Ranson instead of the bonds ; and accordingly such deposit was made, and such a certificate was obtained by Humphreys to be carried to Ranson.
It does not appear at what precise time Humphreys returned to Jefferson. He was not able, he says, on his return, nor for some time thereafter, to pass the receipt to Ranson, and then only through a friend, Da*. Cameron, who lived near Ranson. At all events, Ranson did not receive it until on or about the 11th of December 1863 ; and that appears to have been the first information he received in regard to the purchase of Confederate bonds after handing the memorandum on that subject to Humphreys as aforesaid. On that day, to wit: the 11th of December 1863, he wrote to Campbell, refusing to receive the bonds ; and on the 28th January 1864, Campbell"wrote to Ranson, acknowledging the receipt of the latter’s said letter of December 11th, expressing regret at his refusal of the bonds, and saying that he, Campbell, had not been able to use the bonds, in consequence of their having been registered in the name of Ranson. In Rauson’s said letter of December 11th, 1863, he said, among other things, “ The enclosed paper has just been handed me by Dr. Cameron. It is the first intimation that I have had that any action had been taken with regard to the land payment due me last January. I am .sorry to be obliged to say that I cannot now receive the Confederate bonds for the said land payment. If the matter could have been attended to, and the Confederate bonds obtained at the time the payment fell due, that is, in January last, I would have received them ; but by the 18th of August, the date of the bonds, they had de *412 predated in value to such an extent, that I do not thinir y°u cau consider me at all unreasonable in declining to rece‘tve them now. I gave Mr. Humphreys amemorandum last winter, stating my willingness to receive Confederate bonds for the amount due from Maddox in January 1863 ; but that statement contemplated that the-arrangement should be made, or the bonds obtained, at the'time the land payment fell due, and not that the-matter might be postponed for any cause whatever, and such payment made at the option of the debtor, at anytime thereafter, without reference to any changes that might occur in the financial condition of the country. Please let the bonds of Mr. Maddox due in January 1863 and 1864, remain for the present unpaid, and stand as they are, running on interest, until the times are more settled.” “I have made the proper endorsement upon the back of the statement of the cashier, or such as will place the Confederate bonds again at your disposal.” These bonds were ultimately withdrawn by Campbell from the bank, were changed from Hanson’s name to that of Campbell, and perished in the hands of Campbell at the fall of the Confederacy.
Thus stood the matter until March 1868, when John B. Baldwin, trustee in the deed of trust aforesaid, being about to execute the trusts of the said deed by a sale of the land thereby conveyed, having been requested so to do by said Bauson, for default in the payment of the said two bonds, due the 26th of January 1863 and 1864, thereby secured, an injunction was awarded to prevent him from so doing by the judge of the Circuit court of Bockbridge county, on a 'bill then filed in said court by-said Campbell against said Bauson and others. In April 1868, the defendant fianson filed his answer, and! on the 25th of that month the cause came on to be heard on the bill, answer, general replication thereto* exhibits, and examination of witnesses, and on tbe motion of the said defendant to dissolve the said injunc *413 tion ; and on consideration thereof the said injunction "was accordingly dissolved. But by leave of the court 'the plaintiff thereupon filed an amended and supplemental bill, on which the said injunction was reinstated, but only as to the said bond which became due on the ‘26th of January 1863 ; and leave was given the defendants to submit their motiou in vacation for a dissolution of the renewed injunction. In MayJL868, the defendant Hanson filed his answer to the amended bill; and in June 1868, on the motion of the said defendant, •made upon due notice, a decree was made by the judge of said court in vacation, dissolving the said last mentioned injunction, and was entered by order of the said judge as a vacation decree in the book of records of said court. To this decree the plaintiff applied for and, obtained an appeal and supersedeas to the District court at Charlottesville, by which the said decree was after-wards, to wit: on the 3d day of July 1869, affirmed. Application was thereafter made by the plaintiff to a judge of this court, for an appeal from, and supersedeas to, the said decree of affirmance ; which was accordingly granted.
The appellant, Campbell, and the appellee, Hanson, have conflicting and competing theories of this case, and the question we have to consider is, which of them is ■sustained by the pleadings and the proofs in the cause.
The appellant’s theory is, that wishing to pay at maturity the bond of Maddox to Hanson, which was to be•come payable on the 26th of January 1863, and which he had assumed to pay by his agreement with Maddox, he empowered Humphreys in December 1862, to call on Hanson and make such payment by a check on the Bank of Hockbridge, which the appellant, Campbell, gave him ■for the purpose, and which was of course payable in Confederate money, being then the only currency of the country,- that Humphreys, who was a connection of -Campbell, and a friend and neighbor of Hanson, living *414 about five miles from bis residence in Jefferson, but then 011 a v's^ to Rockbridge, was about to return to his-k°me Jefferson, when he was empowered, and the check was given him, as aforesaid ; that be accordingly returned home, and very soon thereafter called on Ran-son and offered to make the payment aforesaid; but Ranson refused to receive it, being unwilling to accept Confederate money in payment of the said bond ; that Ranson expressed his willingness however to receive Confederate bonds of a certain description in payment of said debt, and was “keen” and “anxious” to do so; and accordingly proposed to empower Humphreys, as his-agent, to effect such an arrangement for him with Campbell ; that Humphreys undertook such agency, but for his own security required Ranson to state in writing what he was willing to do; and, accordingly, Ranson made and signed with the initial letters of his name, and handed to Humphreys, the memorandum, of which a copy marked “D” is exhibited with the original bill, and another copy marked “J. H. Ho. 2,” is filed with the deposition of said Humphreys. That when Ranson refused to accept Confederate money in payment of the said debt, Humphreys ceased to be the agent of Campbell, and when he undertook at Ranson’s request, to endeavor to affect an arrangement with Campbell for the payment of the said debt in Confederate bonds as aforesaid, he became the agent of Ranson only, and not the agent of Campbell; that this transaction took place shortly before the said debt became payable, but at what precise time is uncertain ; that no time was defined either in the said memorandum or orally for the delivery of the said Confederate bonds, and Ranson knew that in the then state of the country in which the parties resided, and from the difficulty and danger of communications between them, it might require much time to consummate the proposed arrangement, and he must, therefore, have designedly left the time for such consummation *415 indefinite. That immediately after the interview between Ranson and Humphreys the latter wrote to Campbell informing him thereof, and enclosing a copy of the memorandum aforesaid, but the letter and its contents was never received; that on the 20th of January 1863, six days before the said debt became payable, Humphreys wrote again to Campbell referring to the former letter and its contents, saying : “I had stated all about my interview with Mr. James M. Ranson, his declining to receive payment, and desiring you would procure registered bonds for him from the Confederate government. He wanted six separate bonds, each 1,000 dollars, and one for 150 dollars ; making $6,150.56, the amount of your payment due the 26th of this month but enclosing no copy of the memorandum aforesaid in this letter; that this letter was not received by Campbell until early in April 1868; that in the latter part of July or first of August 1863, he applied to Myers, cashier of the Bank of Rockbridge, for the purpose of buying Confederate bonds for Ranson according to the directions contained in the letter of Humphreys as aforesaid, and succeeded during that month in procuring Confederate eight per cent, bonds of the required aggregate amount of $6,150.56,'payable to James M Ranson, for which he had to pay a premium of $1,000, but owing to some regulation of the Confederate treasury department, he could not get bonds of the pai ticular amounts required by Ranson ; that Humphreys visited Rockbridge and came to Campbell’s house in August 1863, after the latter had procured the said bonds, and when he had them in his house; that on that occasion Humphreys handed to him, Campbell, the memorandum aforesaid, requesting him to lay it away carefully, as it was Mr. Ransou’s orders or instructions to him upon which he had acted, and thereupon Campbell handed to him, Humphreys, the bonds to carry to Ranson, instructing him to obtain from Ranson the note *416 for which these bonds were due ; that this was the first occasion on which he, Campbell, had ever seen the memorandum aforesaid : that Humphreys returned to Jefferson again in September 1863 : that he did not carry Confederate bonds with him, fearing he might be captured by the public enemy on the way, but left them in the bank of Rockbridge for safe keeping in an envelope endorsed as the property of Janies M. Ransou, taking from Mr. Myers, the cashier, a statement thereof; that Humphreys could not go to see Ranson for some time after his, Humphreys’, return to Jefferson, by reason of the pickets of the enemy; but as soon as he could, which was several weeks after his return, he sent the said statement to Ranson by Hr. Cameron ; that on the receipt of this statement, Ranson wrote a letter to Campbell, dated December 11th, 1863, refusing to receive the Confederate bonds, and returning the said statement with an endorsement made thereon, for the purpose of placing the Confederate bonds again at Campbell’s disposal ; that Campbell answered this letter on the 28th of January 1864, expressing his regret that Ranson had refused to receive the bonds, and saying that he had purchased them in pursuance of authority received from Ranson, and with as little delay as practicable ; that he afterwards received the bonds from the bank under protest, and with much difficulty succeeded just before the end of the war in having them transferred to his name, but never derived any benefit from them, and they perished in his hands ; that Ranson never revoked the authority given by him to Humphreys as aforesaid, although they lived near together, and such revocation might easily have been effected at any time if it had been desired by Ranson ; that Campbell having complied in all substantial respects, andas nearly as possible, with the request of Ranson, as communicated through his agent Humphreys in regard to the purchase of the said bonds, and the said Humphreys, as such agent, and *417 "in pursuance of full authority thereto with which he had been invested by Ranson, having received the said bonds of the said Campbell as a full satisfaction of the said bond of Maddox to Ranson due on the 26th of January 1863, the said bond was therefore, in effect, paid .and discharged, and the said Ranson is estopped in equity from enforcing its payment by a sale under the deed of trust aforesaid or otherwise.
This is Campbell’s theory, and if it be well founded in fact, there can be no doubt, I presume, but that he is entitled to succeed in this controversy.
On the other hand, Ranson’s theory is, that Maddox’s debt to him was an ante-war debt, payable in specie, and well secured by deed of trust on real estate much more than ample for its payment; that he was not anxious for its payment during the war, and was wholly unwilling to receive such payment in Confederate money ; that accordingly, when Humphreys, in December 1862, or in January 1863, as the agent of Campbell, offered to pay the bond of Maddox to Ranson, which was to become due on the 26th of January 1863, by the check of Campbell on the bank of Rockbridge, he, Ranson, refused to receive such payment; the value of Confederate money, as compared with gold, being then but as three to one ; that, although unwilling to receive Confederate money in payment of the said debt, he was yet willing, but not anxious, to receive such payment in Confederate bonds of a particular description at pai-, and accordingly so informed Humphreys at the time of refusing to receive the check aforesaid ; that the memorandum given by him to Humphreys at that time, at the latter’s request, truly sets out what he was willing to do, aud consented to do ; that he intended by the memorandum only to say what he had just said orally, and what he is advised is the true construction of the writing, that payment of the bond at the time of its maturity might he made in registered eight per cent. Confederate bonds *418 of the designated description at par ; that he did not ma^e Humphreys his agent in the transaction for any PurPose’ with him only as the agent of Campbell, connecting with his refusal to accept the offered payment in Confederate money an expression of his willingness to accept payment in Confederate bonds, as-aforesaid, at par; that, not having constituted Humphreys his agent for any purpose, it was not necessary or proper to revoke an agency which never existed; that, holding the bond of Maddox, well secured by deed of trust on real estate, and having only consented to receive Confederate bonds of a particular description, though even then greatly depreciated in value, in payment of the debt, at maturity, it was not incumbent on him to do anything or say anything more on the subject, but he had a right to remain quietly and passively until the debt became due, knowing that if it should not then be paid in Confederate bonds, as aforesaid, or otherwise, it would thereafter remain, in all its force and with all its security, as a specie debt; that, although Campbell-was informed of Hanson’s willingness to accept Confederate bonds, as aforesaid, in payment of the said debt at least as early as April 1863, when Confederate currency-stood at the rate of five or six to one, as-compared with gold, yet he made no purchase of Confederate bonds on account of Hanson until some time in August 1863, when Confederate currency had depreciated to such a-degree as to be of the value ónly of twelve or thirteen to one, as compared with gold; that Hanson never received any intimation from any source in regard to a purchase being made of Confederate bonds with a view to the payment of the said debt due to him on the 26th of January 1863, from the time he handed the memorandum to Humphreys in December 1862, or January 1863, as aforesaid, down to the 11th of December 1863, when Dr. Cameron handed him a statement of the Confederate bonds which had been purchased and deposited *419 in the hank of Bockbridge, as aforesaid, and when Confederate currency had depreciated in value to less than eighteen or twenty to one, as compared with gold ; and that, therefore, he had a right to refuse to receive the said Confederate bonds in payment of the said debt, as he did by his letter to Campbell of December 11th 1863, and the said debt still remains wholly due and unpaid, and the said deed of trust for its security still remains in full force and effect.
This is Eanson’s theory, and if it be well founded in fact, it is evident that he is entitled to succeed in this controversy.
This case has been ably argued by the counsel on both sides, and the counsel 'for the appellant have certainly maintained his theory with great force and ingenuity. But I am decidedly of opinion that the theory of the appellee, Eanson, is fully sustained, in substance at least, by the pleadings and the proofs in the cause.
That Eanson was willing, in December 1862, or January 563, to receive payment at its maturity, on the 26th of the latter month, of a specie debt, well secured on real estate, in a medium at par, whose market value was then not worth more than about one-third of the same amount of specie, and whose tendency was downward, is a fact of which strong and clear proof ought to be required. Such strong and clear, and indeed conclusive proof is afforded in this case by the memorandum, written and signed by Eanson,. and handed to Humphreys as aforesaid. And if, on the 26th of January 1863, when the said debt became due, Campbell had paid, or offered to pay it in Confederate bonds, of the description and amount prescribed by the memorandum aforesaid, there can be no doubt but that Eanson would have been bound to receive such payment, and to surrender the evidence of said'debt to be cancelled.
But still stronger proof ought to be required of Ban-son’s willingness at the time of handing the said mem *420 orandum to Humphreys, to give to Campbell the privi^ege °f Paying the said debt in Confederate bonds, not at *ts matm’ily 011 the 26th of January 1862, but, indefinitely, at any future time thereafter, no matter how great might be the depreciation of such bonds in the meantime. Certainly the said memorandum ought not to be consti'ued as giving such a .privilege, unless an intention to do so be very plainly expressed ; but should rather be construed as confining the privilege to the time of the maturity of the debt, unless the latter construction would be plainly contrary to the iutention of the author of the instrument.
Now, I think, that the plain and reasonable meaning of the memorandum, especially when viewed in the light of the surrounding circumstances, is to confine the privilege to the time of the maturity of the debt. _ Campbell wished to provide for the payment of the debt at or before its maturity, and accordingly made an offer through Humphreys, his agent, about a month before the debt became due, to pay it by a check on the Rockbridge bank, which would have been equivalent to a payment in Confederate currency. Rauson declined to receive such payment, but said that payment might be made in Confederate bonds of a certain description ; and upon being requested by Humphreys to put this down in writing, he did so, in these words : “$6,150.56. Hue 26th January 1863, from 8. J. Campbell to James M. Ranson. This can be paid in registered eight per cent. Confederate bonds, issued to run the longest period of time, bought at par—six one thousand dollar bonds, and one 150 dollar bond. They of course must be bought with treasury notes of the issue prior to December 1st, 1862. J. M. R.” “ This can be paid.” "When ? Certainly at the maturity of the debt, and not at any time thereafter. If so, at what time ? Could it have been intended that Campbell might pay the debt in Confederate bonds at any time thereafter he might think proper to do so ? *421 Does not the variable nature of the subject, its tendency to depreciation, conclude such an idea ? Could it have been intended to convert this specie debt of Maddox, so well secured by deed of trust on real estate, into a mere parol promise of Campbell to pay the amount in Confederate bonds on demand, or at his pleasure? Indeed, there was not even a parol promise of Campbell to make such payment, but a mere privilege offered him to do so. How long was he to have this privilege ? The writing declares—“Dae 26th January 1863,13 when of course payment in this privileged form was required to be made, else the debt would remain in all its force as a specie debt. It was all important that some time should be spec.fied for such payment, and this is the only specification of time in t. e writing, and was plainly made to indicate when the payment was to be made. The writing is minute in the description of the bonds which Bauson was willing to receive. “ They must be registered eight per cent. Confederate bonds—issued to run the longest period of time—bought at par—six oue thousand dollar bonds, and one 150 dollar bond. They of course must "be bought with treasury notes of the issue prior to December 1st, 1862.” Can it be supposed that Bauson would have been thus minute in these descriptions, some of which are apparently unimportant, and that he w'ould have left unnamed so important a matter as the period when the privilege he gave of making payment in such a medium was to be exercised? That the amount of the Confederate bonds named in the memorandum is precisely the same with the principal of the debt, without any provision for interest which might accumulate, confirms the view' that payment if made in such bonds was required to be made before there w'as any accumulation of interest, that is at the maturity of the debt.
But it is argued that Bauson knew it would require time to communicate "with Campbell and to procure the bonds; that he could not have expected that these things *422 could be done before tbe debt became due, and that therefore he must have intended that payment might be made in these bonds after the debt became due as well _ . as before. It was not certain by any means that the bonds could not be procured and delivered by the time the debt was to become due. The memorandum is not dated, and it does not appear precisely when it was given. But the probability is, that it was given about a month before the debt became due: in which time Banson might well have thought that the bonds could be procured. At all events, he had a right to require payment to be made in these bonds at the maturity of the debt, as the condition on -which the privilege might be secured. And he had a right also to require that the bonds should be precisely of the description named in the memorandum. It is no excuse to say that Campbell did not hear of the matter in time, and could not procure and deliver the bonds before the debt became due ; or that he could not, by reason of any regulation of government or otherwise, procure such bonds as were required. The answer to all such excuses is, that a creditor has a right to demand payment of a debt, according to the terms of the obligation ; and if he is willing to concede to his debtor the privilege of discharging it in some other prescribed mode, the mode so prescribed must be strictly pursued, or the debtor will lose the benefit of the privilege, and remain bound to discharge the obligation according to its terms. It may be the misfortune of the debtor, and not his fault, that he did not do what was required to give him the benefit of the privilege; but, whether it be his misfortune or his fault, the effect is the same: The condition precedent not having been performed, or not having happened, the privilege is lost, and the debt remains in full and absolute force. It will not do for the debtor to say that the condition was substantially performed, though not at the precise time, or in the precise mode prescribed, and that the creditor *423 would have been uo better off if the condition had been •strictly performed. The creditor may prescribe his own terms of defeasance, however capricious and unmeaning they may be, or seem to be : Cajus est dare, ejus est disponere. The debtor is not bound to accept or perform them; and, if they be not performed, whether it be from his choice or from necessity, he only remains where he •was before, and is bound to perform his obligation. To be sure, the creditor may accept substantial and substituted performance, and thus give it the same effect as if it had been in strict and literal pursuance of the pi-e-scribed terms. But then there must be clear evidence of such acceptance, either by words or act.
But suppose it be conceded that, according to the true construction of Hanson’s memorandum, he consented to accept payment of the debt in Confederate bonds, though delivered after the debt had become payable, and that it was time enough for Campbell to buy the bonds after he first heard of the willingness of Hanson to receive payment in them, which was in April 1868. It was certainly the duty of Campbell, if he wished to make payment in that way, to procure the bonds with as little delay as possible. Already about four months had elapsed since the memorandum was given, and Confederate bonds had much depreciated in value since then, and their tendency was downwards. Did he do so ? On the contrary, he did not procure the bonds until August 1863, four months thereafter, when, in consequence of the battle of Gettysburg, which was fought in the meantime, and- other causes, Confederate securities were reduced to a very low ebb. He bought them then, without any communication with Hanson, dr even with his alleged agent, Humphreys, on the subject! Can this delay, and this act of Campbell, he excused, and :are they not, necessarily, fatal to his pretensions, in any view which can he taken of them ? He knows the necessity of excusing them or obviating their effect in *424 order to Ms success in this case, and he therefore seeks do so upon the ground that the bonds were accepted Humphreys, as the agent of Ranson, and that Humphreys had full authority, as such agent, to accept them payment of the debt.
Certainly Ranson still had a right to accept Confederate bonds in payment of the debt, notwithstanding their very great depreciation in value since he first made an. offer to do so ; and tihat acceptance might as well.be by an agent as in proper person.
But, then, the evidence ought to leave no doubt on the judicial mind as to the fact of such acceptance, and if it was by an agent, as to the authority of the-agent to make it.
It is not pretended that there was any such acceptance by Ranson personally, or any, otherwise than by the agency of Humphreys : Was there an acceptance in that way?
Was Humphreys the agent of Ranson for any such purpose, or indeed for any purpose at all, in connection with this matter ? I have already shown, I think, that' he was not. Campbell in his amended bill, varying the-ground taken in the original bill, alleges such an agency, and lays much stress upon it; indeed, places the whole case upon that issue. But Ranson in his answer to the amended bill expressly denies the allegation. 44 It' is not true as is now stated,” he says, 44 that Mr. John Humphreys was at any time, or to any extent, the agent of Ms respondent, for any purpose connected with the subject of this controversy. He came to respondent as the friend, connection and agent of the complainant, and he returned with a message from respondent to complainant in response, which, to avoid all mistake or misunder-standing, was reduced to writing, and is now in the-papers of this cause as 4 J. H. Ho. 2.’ Respondent gave him no agency or authority of any kind, and dealt with him only as the agent and messenger of complainant.” *425 “ The consent to accept Confederate bonds in payment according to paper J.' H. Ho. 2,’ was not upon any suggestion of respondent, but was a reluctant concession to the importunity of said Humphreys, who urged it in the interest of the complainant. When Mr. Humphreys left the house of respondent on the occasion referred to, respondent had not the least idea that he could possibly regard himself as any thing more than the bearer of a return message to his friend, the complainant, who sent him. ” ’
How here is an express and positive denial in the answer, of the agency alleged in the amended bill, and there is nothing in the evidence which can be sufficient to overthrow this denial. Indeed, the evidence, taken altogether, confirms it. To be sure Humphreys, in his deposition, does speak of his being the agent of Ranson, and of his acting as such in the matter ; and he no-doubt thought so when he gave his evidence; but he shows, in answer to questions put to him in his cross-.examination, that he was, in fact, no agent of Ranson at all. To question 16, ££ Did you expect or undertake to do more than communicate Mr. Ranson5 s memorandum to Mr. Campbell he answers, £ £ First I was invested with verbal authority from him to make the communication to Mr. Campbell. I declined doing so unless I had authority from him, when he gave me this paper, £ J. H. Ho. 2.' I did not undertake to do more than communicate Mr. Hanson's memorandum to Mr. Campbell.” To question 19, “Had you any authority to say or to do anything in respect to Mr. Ranson’s business, except what was given or recognized in that paper V' he answers, “J don't think I had.”
How look to the paper and see if it can properly be construed as giving any authority to Humphreys. I have already set it out in this opinion, and need not here repeat it. It only says in effect: the debt will be due on the 26th of January 1863, and payment may be *426 made in Confederate bonds of a certain description, and this is said in answer to an offer to make payment in Confederate currency, and in connection with Ranson’s refusal to accept payment in such currency. And the memorandum containing this answer is handed to the messenger by whom the offer was brought to be carried back or sent back to the person from whom the offer came. Can this amount to the creation of such an important agency as that which is now contended fpr ? I think not.
But, even if such an agency in fact existed, does the evidence show that Humphreys accepted the bonds, as such agent, in payment of the debt % I think not. The bonds were handed to him, if at all, “as a friend of both parties,” to take to Ranson. It was a convenient opportunity to send the bonds to Ranson, and as such, Campbell availed himself of it. But Humphreys apprehending that the bonds might be lost in the event of his being taken prisoner on the way, concluded to leave them in bank for safe keeping, and carried a statement of the1 cashier in their stead. It is evident that Campbell, when he wrote the letter of the 26th of January 1864 to Ran-son as aforesaid, and all the facts were fresh in his memory, had no idea that Humphreys as agent of Ranson had accepted the bonds in payment of the debt. “I received,” he says, “your letter, dated December 11th. I am truly sorry that you had found it necessary to refuse the registered bonds which I went to great expense to procure,” &c. How could he then refuse them, when, according to the theory now set up, he had already accepted them through his agent, Humphreys % In all that letter, not one word is said about such an acceptance or such an agency. And although that letter is in answer to one from Ranson stating his "own version of the matter, not a word is said to the contrary ; and it plainly shows, that although Campbell thought hard of Ran-son’s refusal to accept the bonds, he did not then doubt *427 his legal right to do so, and intended to make the best of his situation. This idea that the bonds were accepted in payment of the debt by Humphreys as Hanson’s ■ agent, seems not to have existed in the mind of Campbell even when the original bill was filed, as we see no trace of it there ; and it was probably engendered by the parol evidence given in the cause and by the stress of the case, which, without its aid seemed to be in danger of being lost. It therefore makes its first appearance and is prominently set forth in the amended bill. How I do not mean to say that Campbell in his amended bill, or Humphreys in his deposition, made any statement which they did not respectively believe to be true. They no doubt conscientiously believed what they stated. There is an apparent inconsistency, certainly, between the original and amended bills ; but the cause of that is explained in the latter, and I have treated the case as it is stated in the latter, so far as that is inconsistent with the former. The instance we have here, is only another illustration of the danger of relying on the loose recollection of witnesses as to remote transactions in which they are interested, or when their feelings are in favor of one of the parties rather than the other ; and also of the inferiority of such parol evidence to contemporaneous written evidence on the same subject, fortunately, there is in this case contemporaneous written evidence of the transaction, which I think leaves no room for rational doubt as to its true character.
I am therefore of opinion, that there has been no accord and satisfaction of the debt in controversy; that it has not been paid in Confederate bonds or otherwise ; and that Hanson is not estopped in equity from enforcing the payment of the said debt, or from having a sale made under the deed of trust for that purpose, if necessary.
There is another question raised by the original bill, *428 and noticed in the argument, of which it may be necessary to take some notice here; and that is, in regard to *ke n°tice °f the sale which was about to be advertised by the trustee under the deed of trust, when the injunction was awarded in this case. It appears from ■ the-answer to that hill, and exhibit Ho. 1 file'd therewith, that before the award of the said injunction, an arrangement was made between the parties for the settlement of’ all the questions in controversy in the cause except in regard to the payment or accord and satisfaction of the said debt due on the 26th of January 1863, as contended for by the appellant, as aforesaid. The advertisement aforesaid was never inserted in a newspaper, and there can now, of course, be no sale under it. The trustee in the deed, if it be necessary to execute the trusts thereof, will of course proceed according to law and the provisions of the deed.
I am of opinion that there is no error in the decree of the District court, and am for affirming it.
The other judges concurred in the opinion of Mon-cure, P.
The decree was as follows :
This case, which is pending in this court at its place-of session in Staunton, having been heard, but not determined by the court at the said place of session : This day came here the parties by their counsel; and the court having maturely considered the transcript of the record of the decrees aforesaid and the argument of counsel, is of opinion, for reasons stated in writing and filed with the record, that there is no error in the said decrees : Therefore, it is decreed and ordered, that the same be affirmed, and that the appellant pay to the appellee, Eanson, thirty dollars damages and his costs by him about his defence in this behalf expended. And it *429 is ordered that this decree be entered on the order book here, and be certified to the clerk of the court, where the case is pending as aforesaid, who shall enter the same on his order book, and certify it to the clerk of the said Circuit court of Rockbridge county.
Decree aeeirmed.